IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

v.

BERGAL L. MITCHELL, III,

         Defendant.

_____

**REPORT AND
RECOMMENDATION**

11-CR-00057-RJA-JJM

        Defendant is charged in an Indictment [1][1] with conspiracy to violate 18 U.S.C. §§666(a)(1)(B), 1163, 1168(b), and 1343 (Count I); theft or bribery from a program receiving federal funds, in violation of 18 U.S.C. §§666(a)(1)(B) and 2 (Count 2); theft by an officer of a gaming establishment on Indian lands, in violation of 18 U.S.C. §§1168(b) and 2 (Count 3); wire fraud, in violation of 18 U.S.C. §§1343 and 2 (Count 4); money laundering of the funds derived from the conduct charged in Counts 2 and 4, in violation of 18 U.S.C. §§1957(a) and 2 (Counts 5-12); and making material false statements to FBI agents, in violation of 18 U.S.C. §1001(a)(2) (Count 13).

        Defendant has moved for suppression of statements allegedly made by him on September 10, 2008 on the grounds that he was subjected to a custodial interrogation without the benefit of the warnings under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and that his statements were otherwise involuntarily given [53]. The motion has been referred to me by Hon. Richard J. Arcara for initial consideration [6]. An evidentiary hearing was held before me on January 3, 2012 [64], at which FBI Special Agent ("SA") Brent Isaacson and defendant testified. Thereafter,

---

[1]     Bracketed references are to CM/ECF docket entries.

the parties filed post-hearing submissions [68, 69], and oral argument was held on June 28, 2012 [71].

On July 30, 2012, I issued a Report and Recommendation [73], concluding that defendant was not in custody during the interview (id., pp. 7-11), but recommended suppression of defendant's statements on the grounds that the government had not proven that his statements were voluntary - an issue that was not addressed by the government in its post-hearing brief (id., pp. 11-13). The government moved for reconsideration of this aspect of the July 30, 2012 Report and Recommendation [82]. Following briefing on this motion [84, 92, 96], I granted the government's motion and, upon reconsideration, rescinded my July 30, 2012 Report and Recommendation [73] "for further consideration of the issue of voluntariness". October 5, 2012 Text Order [98]. In conjunction with my decision to grant reconsideration, I permitted the government to respond to that aspect of defendant's pretrial motion seeking suppression of his statements on voluntariness grounds and afforded defendant the opportunity to reply. Id. Having considered these submissions [106, 113], as well as the parties' prior submissions, I now recommend that defendant's motion to suppress be denied.

**BACKGROUND**

At the hearing, SA Isaacson testified that he, along with SAs Robert Gross and Gary Jensen, participated in an investigation of defendant. [64], pp. 5-6. He knew defendant from his previous investigations on and around the Seneca Indian Reservation (id., p. 8). A few weeks prior to September 10, 2008, he and the other agents formulated a plan to get defendant to come into the Jamestown FBI office for questioning (id.). One or two days before the interview,

SA Isaacson telephoned defendant, and after some "small talk . . . explained to him that the FBI was involved in an investigation of general credit card fraud and [was] concerned that perhaps one of his personal credit card accounts had been compromised. And . . . asked him if he would please come to our office . . . on the 10th to speak with us and we set up an appointment for him at 9:00 a.m. that day" (id., pp. 9, 43). SA Issacson admitted that the information which he provided to defendant for the need to come to his office "was a ruse" (id., p. 9), and that he lied to defendant in order to get him to come in (id., p. 25).

Defendant arrived at the Jamestown FBI office on September 10, 2008, at approximately 9:15 a.m., and was met by SA Isaacson (id., pp. 9, 11-12). Their greeting was "friendly and . . . polite" as they "had known each other" (id., p. 12). SA Isaacson testified that he "had numerous conversation with him up until then", and that "[t]hey were always pleasant, friendly" (id.). He described the layout of the FBI office in Jamestown: a publicly accessible hallway on the second floor of the building leads to a door that enters into a "small . . . lobby area" of the office (id., pp. 10, 25). A door separates the lobby from the interior office area, which is "one large contiguous room", with "no internal doorways that separate one office from another" (id., p. 10). Both doors are locked from the outside when they are closed, but always unlocked from the inside, allowing individuals to exit without a key (id., pp. 10-11, 15).

SA Isaacson could not recall whether defendant went through the metal detector or had his cell phone seized (id., p. 26). However, he conceded that defendant was not advised that he could make a telephone call (id., p. 27). Defendant was brought into the interior office area to a location in the center of the room they used as the library, consisting of a small table and some book shelves (id., pp. 12, 28). SA Isaacson introduced defendant to SAs Gross and Jensen

and explained to him that his "fellow agents were investigating another matter that they wanted to talk to [him] about" (id.). SA Isaacson did not recall telling defendant that the explanation which he gave to him for coming to the office was a ruse, "because the topic just immediately and forever stayed on the investigation" (id., pp. 12-13, 30). At the beginning of the interview, SA Isaacson told defendant "something along [the] lines" that the interview could be "a life changer" for him (id., pp. 30-31).

The agents were dressed in suits and were armed, but did not display their weapons to defendant (id., pp. 29-30, 53-54). SA Isaacson admitted that he and the other agents shouted at defendant "[f]rom time to time", beginning about halfway into the interview, and that defendant also raised his voice at times (id., pp. 31, 39-40). Defendant was "told . . . at the outset of the interview and several times throughout the interview that he was free to leave" (id., pp. 13, 15). SA Isaacson "explained to him that doors were unlocked, that he could leave any time, that he wasn't under arrest, that he wasn't going to be arrested" (id., p. 13).

Twice during the interview defendant asked to use the lavatory and the interview was "immediately stopped . . . without hesitation"; defendant was then accompanied by SA Isaacson to the exit of the interior office (id., pp. 13-14). While SA Isaacson remained in the interior office, defendant walked unaccompanied to the lavatory, which was in the public corridor (id., pp. 11, 14).

At some point during the interview, the agents concluded that defendant was not being entirely truthful, prompting them to meet twice among themselves (id., p. 16). During each of these two meetings, defendant was escorted to the lobby for approximately five to ten minutes and SA Isaacson explained to him that the "the door is unlocked. If you want to leave, you can

leave" (id., pp. 16-17, 32). However, defendant did not leave, and resumed the interview on both occasions (id., p. 17). Defendant was interested in whether his wife would be charged and the agents told him that his wife was a target, but "explained to him that [they] didn't have any authority to make any promises to him. [They] explained to him that [they] would provide the information he provided to [them] to the U.S. Attorney's Office" (id., p. 32).

During the interview, the agents told defendant that they did not believe that he was giving them information consistent with their investigation (id., p. 17). They also told him that they were convinced that he had committed a crime (id., p. 35). Defendant mentioned that he had kept certain information from members of the Seneca Nation government, and the agents explained that they would need to talk to these people to continue their investigation (id., p. 18). Defendant responded "that this was something that was very bad and but for his family, he would go out on the reservation and blow his brains out" (id.). At some point during the interview, the agents began preparing a statement for defendant to sign, but "[i]t became clear that he was not going to be willing to sign" (id., pp. 37-38). SA Isaacson denied that he or any of the other agents told defendant that they were going to make his life a living hell (id., pp. 18-19) and did not recall telling defendant that he was going to jail for a long time (id., p. 31).

Since defendant kept repeating the information which the agents knew to be inconsistent with their findings, "near the end of the interview we actually told him we don't want to talk to you anymore, we want you to leave" (id., p. 19). SA Isaacson then stood up and gestured for defendant to head toward the exit and opened the door for him (id.). Despite being told to leave, defendant remained in the doorway and "continued to reiterate the information that he had given . . . for at least an hour earlier" (id., pp. 19-20). SA Isaacson "told him several

times, we're done talking to you, we don't want to hear the same thing anymore, go", whereupon defendant eventually left (id., p. 20).

After defendant left the office, the agents became concerned about defendant's comments about harming himself (id., pp. 20-21). They "decided it would be a good idea just to call him and to take his emotional temperature" (id., p. 21). About two hours after the interview concluded, SA Isaacson telephoned defendant and asked him whether he was thinking about harming himself (id.). Defendant explained that "he was going to meet with an attorney and he wanted to cooperate with [the FBI] and he wasn't planning on hurting himself" (id., p. 21). This was SA Isaacson's last contact with defendant concerning this case (id.). SA Isaacson did not recall speaking with the assigned prosecutor, Martin Littlefield, on the day of the interview (id., p. 37). SA Gross' handwritten notes (Gov. Ex. 2) were used to prepare an FBI 302 (Gov. Ex. 1), which was a non-verbatim summary of the three-hour interview (id., pp. 6-7, 23-24).

In contrast to SA Isaacson's testimony, defendant testified that when he entered the FBI office, SA Isaacson took his cell phone and he walked through a metal detector (id., pp. 43-44). He was brought to a room and sat down at a table with an agent in front of him and to either side of him, with the table between defendant and the door (id., pp. 50-51). According to defendant, at the outset of the interview the agents told him that they wanted to ask him questions about Tim Toohey, Michael Dowd, and Barry Halftown (his half brother) (id., p. 44). When defendant responded that he was "not sure" that he should be answering questions about his half brother, the agents walked into a back room for a couple of minutes and when they returned, they told him that "the next few moments are going to change your life, how you answer this question

or that question" (id., pp. 44-45). Defendant again responded that he did not want to answer questions about his half brother "[a]nd then things got tense" (id., p. 45).

According to defendant, "[t]hey started kind of yelling and drilling and that's when . . . the other agent . . . was basically saying, you're going to go to jail for a long time" (id., pp. 45, 57). Defendant denied raising his voice, but stated that if he did, "it was so they would actually hear the answer" (id., pp. 45-46). The agents told defendant that they had talked to the U.S. Attorney and that they would not prosecute his wife if he would just confess (id., pp. 46, 47). While the agents did not expressly tell defendant that he was in custody or under arrest (id., p. 56), they told him he was going to jail, and he "assumed it was going to be that day" (id., pp. 60-61). The agents were "drilling" him and made him believe that he was under arrest and not free to leave (id., pp. 46-47, 59-61). He did not recall SA Isaacson telling him that he was free to leave (id., pp. 51, 53) or that the door was unlocked when he was escorted into the lobby (id., p. 57).

Defendant testified that SA Isaacson walked him to the entrance of the bathroom on one occasion, but stated that he did not feel free to leave (id., pp. 47-48, 51-52). "The only time I felt I could leave [is] when they were kicking me out" (id., p. 49). In response to the agents' accusations that he would destroy the Seneca Nation, defendant stated that he "would rather blow [his] brains out . . ., if not for [his] family, and [he] wouldn't try to destroy the Seneca Nation" (id., p. 48).

Defendant testified that he was surprised when the agents asked him to leave, because he had believed that he was under arrest (id., pp. 67-68). Feeling "lost and confused", he remained in the doorway for approximately five to ten minutes, speaking to SA Isaacson (id., pp.

67-69). The agents then brought him back in for additional questioning, and he remained for an additional 30 to 45 minutes before getting up to leave when he learned that they were preparing a statement (id., pp. 63-65, 68-70). At this point, defendant decided that he needed an attorney, but he could not recall whether he verbalized this to the agents (id., pp. 63-64). He testified that the agents then told him that they would make his "life hell if [he] left", and that "they were going to search all of [his] financial records and everything else" (id., pp. 64-66).

## ANALYSIS

**A. Was Defendant in Custody During the Interview?**

"A suspect is entitled to *Miranda* warnings only if he or she is interrogated while 'in custody.'" Tankleff v. Senkowski, 135 F.3d 235, 243 (2d Cir. 1998). In determining whether defendant was in custody, I must first determine "whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights." United States v. Newton, 369 F.3d 659, 672 (2d Cir.), cert. denied, 543 U.S. 947 (2004). If the answer is no, I must next consider "whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest . . . . Only if the answer to this second question is yes was the person 'in custody'". Id.

"In determining whether a suspect was in custody, we look at all the circumstances surrounding the interrogation." Tankleff, 135 F.3d at 243. Among the factors to be considered are "whether a suspect is or is not told that she is free to leave . . . the location and

atmosphere of the interrogation . . . the language and tone used by the police . . . whether the suspect is searched, frisked, or patted down . . . and the length of the interrogation". Id. at 244.

In arguing that he was subjected to a custodial interrogation, defendant notes that he was "was tricked into entering the interrogation room" (defendant's Post-Hearing Memorandum of Law [68], p. 9), that "the interrogation occurred at a law enforcement facility" (id., p. 10), that "three armed law enforcement officers sat between [him] and the exit" and "yelled at [him]" (id., p. 11), that "his cell phone had been taken" (id.), that the interrogation lasted for three hours (id.), and that he was not told whether or not he was under arrest (id., p. 12).

While some of these factors, including the tenor and length of the interview, might suggest that defendant was in custody, the totality of circumstances leads me to conclude that he was not in custody. The fact that defendant may have been tricked into attending the interview is irrelevant to the question of whether he was in custody. See Oregon v. Mathiason, 429 U.S. 492, 496 (1977) ("The officer's false statement about having discovered Mathiason's fingerprints at the scene . . . . [h]as nothing to do with whether [he] was in custody for purposes of the Miranda rule"); United States v. Hanson, 237 F.3d 961, 967 (8th Cir. 2001) (Arnold, J. dissenting) ("The fact that a mild sort of ruse was employed to get Mr. Hanson to accompany the officers to their office and that the interview occurred in a federal building is not enough . . . to support a conclusion that Mr. Hanson was in custody").[2] I also conclude that the location of the

---

[2] Although I quote from the dissenting opinion, the Eighth Circuit sitting *en banc* later overruled Hanson and adopted its dissenting opinion. See United States v. LeBrun, 363 F.3d 715, 723 (8th Cir. 2004), cert. denied, 543 U.S. 1145 (2005) ("Even if *Hanson* were not distinguishable, we are disinclined to follow it, for we are of the view that . . . it was wrongly decided for the reasons articulated in the dissenting opinion in that case. Accordingly, we overrule *Hanson*").

interview, standing alone, does not weigh in favor of custody, as Miranda warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect". Mathiason, 429 U.S. at 495-96.

Defendant concedes that he was not told that he was in custody or under arrest ([64], pp. 56, 59). "Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992). While defendant testified that he believed the agents' statements to him that he was going to jail meant that he was going to jail that day ([64], pp. 60-61), any such belief was not objectively reasonable under the circumstances.[3] Moreover, there is no objective indication that defendant was restrained in any manner. He does not allege that he was handcuffed, physically restrained, formally placed under arrest, or placed in a locked location. In fact, he was escorted to the lobby and remained there alone (id., p. 61). Defendant also "never said anything to suggest that he believed himself to be in custody, nor did he request to speak with an attorney." United States v. Subeh, 2006 WL 219968, *17 (W.D.N.Y. 2006) (Payson, M.J.), adopted, 2006 WL 1875407 (W.D.N.Y. 2006) (Telesca, J.).

---

[3] *Compare with* United States v. Harris, 613 F. Supp.2d 1290, 1300 (S.D.Ala. 2009), cert. of appealability denied, 2009 WL 2045206 (S.D. Ala. 2009) ("Harris was not subjected to custodial interrogation . . . until Lt. Taylor told him that he might as well tell the truth because he was going to jail anyway").

Defendant's reliance on the fact that his cell phone was taken at the outset of the interview is not persuasive, as nothing in the record indicates that defendant requested, but was denied, access to the phone.

I recognize that "the test for custody is not whether the police in fact let a suspect leave *at the end* of the questioning without hindrance. Rather, it is whether, under the circumstances, a reasonable person *would have believed* that *during* the questioning he or she could leave without hindrance." United States v. Jacobs, 431 F.3d 99, 106-07 (3d Cir. 2005) (emphasis in original).[4] Nevertheless, defendant testified that when the officers asked him to leave, he remained in the doorway for approximately five to ten minutes speaking to SA Isaacson (id., pp. 67-69), and then remained for an additional 30 to 45 minutes before leaving the interview (id., p. 63-65, 68-70). His "willingness to continue the conversation . . . also indicates that he did not experience a significant constraint on his freedom." United States v. Paracha, 2004 WL 1900336, *8 (S.D.N.Y. 2004), aff'd, 313 Fed. Appx. 347 (2d Cir. 2008).

For these reasons, I conclude that defendant was not in custody at the time of his interrogation, meaning that Miranda warnings were not required. However, that is not the end of my inquiry.

---

[4] *Compare with* United States v. Betone, 686 F. Supp.2d 949, 954 (D.S.D. 2010) ("In the circumstances where the defendant was advised that he was free to leave and would not be arrested after the questioning, the pendulum swings strongly in the direction of non-custody when the defendant is then actually free to go at the end of the interview").

**B.     Has the Government Proven that Defendant's Statements Were Voluntary?**

Although I find that the government has proven that defendant's interrogation was non-custodial, I must still determine whether his statements were voluntary. As the government concedes (government's Supplemental Memorandum of Law [106], pp. 2-3), it bears the burden of proving by a preponderance of the evidence that defendant's statements were voluntary. *See* United States v. Connelly, 2007 WL 3124538, *8 (W.D.N.Y. 2007) (Siragusa, J.) ("The government bears the burden of proving by a preponderance of the evidence both, that in the absence of *Miranda* warnings . . . the interrogation of a defendant was non-custodial, and that any statements that he made were voluntary"); Lego v. Twomey, 404 U.S. 477, 489 (1972) ("the prosecution must prove by at least a preponderance of the evidence that the confession was voluntary").

"A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne." Connelly, 2007 WL 3124538 at *8. "To determine whether a defendant's statements were made voluntarily, courts look to the totality of the circumstances surrounding the statements." United States v. Siddiqui, __ F.3d __, 2012 WL 5382482, *11 (2d Cir. 2012). "Relevant factors . . . include the accused's age, his lack of education or low intelligence, the failure to give *Miranda* warnings, the length of detention, the nature of the interrogation, and any use of physical punishment . . . . A defendant's mental vulnerability also bears on the analysis." Id. *See* United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995) (finding that relevant factors include defendant's "background and experience, the conditions of his interrogation and the

conduct of the law enforcement officers"). "No single factor is dispositive". United States v. Corbett, 762 F.Supp.2d 428, 433 (D.Conn. 2011).

Defendant cites several reasons why his statements were involuntary. Defendant's Memorandum of Law [68], pp. 14-16, ¶¶1-13. He first argues that he "had no previous experience in the criminal justice system, and was more easily susceptible to intimidation and the hall marks of law enforcement". Defendant's Post-Hearing Memorandum of Law [68], p. 15, ¶11. However, notwithstanding defendant's lack of prior experience with law enforcement,[5] it is undisputed that he was a businessman who had been a member of the Seneca Nation of Indians Tribal Counsel and a member and vice chairman of the board of directors of the Seneca Gaming Corporation (Indictment [1], ¶4), and there is no evidence suggesting that he had below-average intelligence or mental vulnerabilities. Therefore, this factor does not weigh in favor of concluding that his statements were involuntary. *See* United States v. LeBrun, 363 F.3d 715, 726 (8th Cir. 2004), cert. denied. 543 U.S. 1145 (2005) ("we have concluded that where the defendant possessed at least average intelligence, then his inculpatory statements were not compelled").

Defendant also relies on the alleged coercive conditions of the interrogation. Specifically, he points to the fact that the interrogation took place at FBI headquarters in a secure office, that his cell phone was confiscated, and that three agents, who were visibly armed, sat between him and the exit during the interview. Defendant's Post-Hearing Memorandum of Law [68], pp. 14-16, ¶¶3, 8, 12, 13. However, not every "interview with a uniformed officer at a

---

[5] The government concedes that defendant's allegation that "he had no previous experience in the criminal justice system appears to be accurate". Government's Supplemental Memorandum of Law [106], p. 20.

police station necessarily renders a suspect's statements involuntary". United States v. Coutchavlis, 260 F.3d 1149, 1158 (9th Cir. 2001). While the agents may have been armed, there is no evidence that they drew their weapons or otherwise used them to compel defendant's statements. Since the fact that "most law enforcement officers are armed is a fact well known to the public . . . . [t]he presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon". United States v. Drayton, 536 U.S. 194, 205 (2002).

Moreover, as discussed above, defendant's reliance on the fact that his cell phone was confiscated is not persuasive, as nothing in the record indicates that defendant requested, but was denied, access to the phone. Likewise, there is no evidence that the venue or the seating arrangement acted to preclude defendant from exiting the interrogation. He was not physically restrained or handcuffed. At points during the interrogation, he was escorted to the lavatory and lobby, where he was unattended. [64], pp. 51-52, 61.

In arguing that his statements were involuntary, defendant also emphasizes the conduct of the agents. He points to the fact that agents yelled at him. Defendant's Post-Hearing Memorandum of Law [68], p. 15, ¶ 9. However, "[n]umerous cases have held that questioning tactics such as a raised voice . . . on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne". Jenner v. Smith, 982 F.2d 329, 334 (8th Cir.), cert. denied, 510 U.S. 822 (1993).

Defendant also argues that "[w]ithout any instructions to provide some separation between the stratagem to falsely induce defendant there and the interrogation itself - - the

deception flowed unfettered into the pointed questioning and accusations that led to Mr. Mitchell providing incriminating statements". Defendant's Reply Memorandum [113], pp. 4-5. "To prevail on a claim of trickery and deception, [defendant] must produce clear and convincing evidence that the [EPA] agents affirmatively misled [them] as to the true nature of [their] investigation" and "[i]t must also be shown that the misrepresentations materially induced the defendants to make incriminating statements". United States v. Mitchell, 966 F.2d 92, 100 (2d Cir. 1992).

While SA Isaacson did not specifically advise defendant that he employed a ruse to obtain his presence ([64], p. 13), at the outset of the interview defendant was advised that they were "investigating another matter that they wanted to talk to [him] about" (id., p. 12) and "the topic just immediately and forever stayed on the investigation" (id., p. 13).[6] Thus, even though a ruse was employed to obtain defendant's presence at the FBI's headquarters, the trickery ended there. It did not infect the resulting interview so as to render defendant's statements involuntary. See United States v. Maney, 2006 WL 3780813, *10 (W.D.N.Y. 2006) (Arcara, J./Foschio, M.J.) ("As for Maney's contention that his statement was involuntary because he was misled as to the purpose of the meeting, the court fails to see how Maney's misperception about the agents' objective for the meeting, even assuming the agents in fact misrepresented their true purposes, defeats the otherwise voluntary nature of the encounter . . . . [N]o caselaw supports finding involuntariness based on an affirmative misrepresentation by law enforcement as to the purpose of the suspect's questioning, and Maney offers no authority to support this contention"). See also

---

[6] Even defendant testified that at the outset of the interview, "[t]hey said they wanted to ask some questions about Tim Toohey, Michael Dowd. They had questions about Barry Halftown" [64], p. 44.

Frazier v. Cupp, 394 U.S. 731, 739-40 (1969) ("The fact that the police misrepresented [that defendant's companion had confessed] is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible").

Defendant further argues that he "was given the *Hobson choice* of saving himself or his wife; compelling his incriminating statements". Defendant's Memorandum of Law [68], p. 15, ¶10. This argument appears to be premised on his testimony that the agents "mentioned that I -- if I would fall on a sword for [my wife] or something to that sense, if I confess, they wouldn't prosecute [my wife]". [64], p. 46. Whereas "[a]n objectively unwarranted threat to arrest or hold a suspect's paramour, spouse, or relative without probable cause could be the sort of overbearing conduct that society discourages by excluding the resultant statements", "a factually accurate statement that the police will act on probable cause to arrest a third party unless the suspect cooperates differs from taking hostages". United States v. Miller, 450 F.3d 270, 272-73 (7th Cir.), cert. denied, 549 U.S. 1097 (2006). The statement made to defendant falls into the latter category. Defendant was told that his wife was under investigation ([64], p. 33) and that she was a target (id. at p. 32). Nothing in the record establishes that this was not accurate. Thus, even crediting defendant's testimony, the agents did not make an unwarranted threat to prosecute his spouse.

Defendant further argues that no attorney was present for the interview, that no Miranda warnings were provided, and that he was threatened with jail. Defendant's Memorandum of Law [68], p. 14, ¶¶1, 2, 9 While relevant to establishing the coercive nature of the interrogation, none of these factors is dispositive. *See* United States v. O'Brien, 498 F.Supp.2d 520, 534 (N.D.N.Y. 2007), aff'd, 303 Fed. Appx. 948 (2d Cir. 2008) ("While *Miranda*

advice, if given, is a relevant factor, the failure to *Mirandize* does not alone demonstrate coercion"; "the presence of counsel is relevant but not dispositive"); United States v. Major, 912 F.Supp. 90, 96 (S.D.N.Y. 1996) (despite the agents threat to the defendant that he faced the rest of his life in prison, which was a "dramatic exaggeration" and "improper", this did not render the defendant's statements involuntary when viewed in the totality of the circumstances).

Ultimately, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Mathiason, 429 U.S. at 495. It will also "involve some pressure because its purpose is to elicit a confession. In order to obtain the desired result, interrogators use a laundry list of tactics." United States v. Astello, 241 F.3d 965, 967 (8th Cir.), cert. denied, 533 U.S. 962 (2001). Clearly, this interrogation was no different. There were certainly tactics employed that may have stressed, unsettled, or intimidated defendant.

Notwithstanding the presence of coercive aspects to the interrogation, when viewed in the totality of the circumstances, including defendant's personal characteristics, I do not find that the interrogation was "*so* overbearing and coercive that any resulting statement was not the product of the defendant's own free will." United States v. Willis, 2006 WL 2239738, *6 (W.D.N.Y. 2006) (Larimer, J.) (emphasis in original). Significantly, the agents' conduct "clearly did not cause defendant's will to be overborne as he never confessed to anything that day". Government's Supplemental Memorandum of Law [106], p. 19. *See* United States v. Willis, 2006 WL 2239738, *6 (W.D.N.Y. 2006) (Larimer, J./ Feldman, M.J.) ("Indeed, the fact that Willis refused to sign the *Miranda* waiver form when requested by Officer Post is persuasive

evidence that the interrogation was not so psychologically coercive that Willis' free will was overborne"); United States v. Newton, 2012 WL 170008, *5 (D.Vt. 2012) ("in the face of the agents' questioning, Defendant maintained the firearm was intended only for home protection and not for use in a drug distribution business or for intimidation, thus evidencing his retention of his free will"); United States v. Artis, 2010 WL 3767723, *9 (D.Vt. 2010) ("there is clear evidence that Mr. Artis's will was not in fact overborne. When he was repeatedly confronted with law enforcement's disbelief regarding his account of how he obtained the firearm, he refused to change his story even when told that untruthful statements could be charged as a crime"). Defendant's current protestations that the coercive aspects of the interrogation were so severe that they overcame his free will are also difficult (if not impossible) to reconcile with the fact that he voluntarily and proactively remained at the FBI headquarters and continued speaking to the agents after they terminated the interrogation and asked him to leave.

Therefore, I conclude that the government has established by a preponderance of the evidence that the interrogation was not so coercive that defendant's free will was overborne.

**CONCLUSION**

For these reasons, I recommend that defendant's motion to suppress his statements [53] be denied. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by January 14, 2013 (applying the time frames set forth in Fed. R. Crim. P. ("Rules") 45(a)(1)(C), 45(c), and 59(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision".

Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

DATED: December 28, 2012

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge